# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.
LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom E. Phillip
Joshua D. Uller
Kelly A. Welsh

517 East Wisconsin
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

February 16, 2019

Honorable Lynn Adelman
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE: *United States v. Jason Ludke,* Case No. 16-CR-175

Dear Judge Adelman,

On paper, things don't look good for Jason Ludke. He stands convicted of attempting to provide material support to ISIS. He committed this crime while on supervision for threatening to kill Judge Griesbach and bomb the federal courthouse in Green Bay. He has spent all but 6 months of the last 18 years in prison. He has convictions for property crimes and a sex offense. He doesn't have an education. He lacks a strong support network. He has virtually no employment history. He has abused drugs. His sentencing guidelines are 30 years to life. But as bad as things may look on paper, when we take a closer look at this offense, and peel away some of the layers of his background, we can begin to understand a few things central to the sentencing analysis in this case.

First, while his record looks really bad—both in terms of its length and the seriousness of the offenses it entails—it's not as bad as it looks. The offenses which make up most of his record are a string of relatively petty childish property offenses committed just after turning 17. In the last 18 years, his criminal record—this offense included—consists of him saying inappropriate things. Ludke's conduct here reflects an inability to express himself appropriately. While he may have harbored some unpopular views, he simply lacks the capacity to articulate his views and frustrations in a functional way. It's his

words that get him in trouble. He hasn't done anything that has caused actual harm in almost twenty years. This case is no different. As Ludke's prone to do, he ran his mouth. He didn't think things through. And he ended up embarking on a journey that stood no chance of being completed. He didn't hurt anybody along the way. He didn't threaten to hurt anybody. He didn't have any weapons.

Second, it's somewhat easy—albeit unfortunate and tragic—to understand how Ludke has come to this point in his life. Exposed to alcohol in utero, Ludke was neglected and abused as a child. He has battled with mental illness his entire life, but has never been able to overcome the damage that was done to him. Cognitively limited, Ludke ended up in the criminal justice system at 17, and was in prison by the age of 21. He has spent almost his entire adult life in prison. While in segregation during his first period of incarceration, Ludke discovered Islam. His attachment to Islam has impacted his life significantly. Yet it's always been less about religion and more about connection and identity. For the first time in his life, Ludke felt a part of something and welcomed. Yet his lack of understanding has led to an attachment to fringe elements well outside the mainstream. His conduct here is the product of that misunderstanding and his inability to express himself.

Jason Ludke is not a terrorist. He's low hanging fruit. Nonetheless, he has committed a crime, and for that he needs to be punished. However, the sentence recommended by the guidelines (and likely requested by the government) fails to reflect the facts of this case or Ludke's history. This memorandum addresses those two factors as well as the other objectives of § 3553(a), including the problems with the terrorism guidelines. Ludke submits that a sentence of five years is appropriate.

## I.    Ludke's History & Characteristics

As the social history report (attached as Exhibit A) reflects, the odds were stacked against Ludke from the start. His mother (Connie Walls) drank heavily while pregnant with him; fetal alcohol exposure was his starting line in life. While it's impossible to tell the extent to which Ludke's fetal alcohol exposure has contributed to his cognitive limitations, it certainly plays a strong part.[1] So too does the fact that once out of the womb, Ludke was

---

[1] Fetal alcohol exposure creates brain damage that leads to, amongst others, the following behaviors: lack impulse control, trouble thinking about future consequences of current behavior, difficulty planning, connecting cause and effect, delaying gratification, tendency towards explosive episodes, and vulnerability to peer pressure. U.S. Dept. of Health and Human Services: Substance Abuse and Mental Health Services Administration, *Addressing Fetal Alcohol Spectrum Disorders (FASD): A treatment improvement protocol* (2014); *see also,* Julie Och, U.S. Probation Office, *Fetal Alcohol Spectrum Disorders and Crime*, XLI News & Views 4

thrust into a neglectful and abusive environment. Child Protective Services became involved in Jason's life when he was just two, and opened a CHIPS case when he was three. Case workers and daycare providers noted that Jason's father (Craig Ludke) was never around, and his mother "does no mothering at all." Ex. A at 3. Ludke had terrible hygiene, was often dressed inappropriately for the weather, and most importantly, was developmentally delayed. He was afraid of water. He was often left unattended. Other times, his mother would pass out from intoxication, and a three-year old Jason would be found running around the neighborhood unsupervised.

On Christmas day in 1994, when Ludke was just four, his mother threw him across the room. Jason struck his head when he landed, resulting in criminal charges. Jason was eventually removed from his parents' home and placed into foster care. As a five-year old, he was functioning at a two-and-a-half or three-year old level. When he had visits with his parents, he would return to the foster home hungry and dirty, with bruises, his clothes soaked in urine and filled with feces. While in foster care, Jason showed improvement. The social worker recommended Jason stay in foster care, but Jason was soon returned to live with his father, who had separated from his mother, before the dispositional order expired.

Within months of the CHIPS order's expiration, CPS was receiving complaints about Ludke's mother's intoxication and leaving Ludke and his sister unattended. In December 1998, police found Jason and his sister (Jennifer Ludke) standing outside a Green Bay tavern while Connie was inside drinking. Protective services filed another CHIPS petition. Craig often talked about giving the children up for adoption, but by the time Jason was nine, Craig was the primary caretaker. Jenifer remembers Craig kicking Jason out of the home, telling him, "I fucking hate you, I wish you were dead." At one point, police found Jason living out of a dumpster.

This early childhood trauma only worsened Ludke's isolation and self-worth. But it likely did a lot more. Studies show that the type of neglect Ludke experienced is associated with a host of developmental problems, including "a greater risk for emotional, behavioral, and interpersonal relationship difficulties later in life," "poorer impulse control," and "cognitive problems, academic delays, deficits in executive function skills, and difficulties with attention regulation." National Scientific Council on the Developing Child, *The science of neglect: The persistent absence of responsive care disrupts the developing*

---

(March 14, 2016) (Fetal alcohol syndrome is associated with many behaviors, including poor social skills, problems with behavior and impulse control.).

*brain*. Center on the Developing Child at 6-7, Harvard University (2012).[2] Throughout his entire life, Ludke has shown manifestations of each of these effects of childhood trauma.

Jason turned seventeen in November 1997. He was an adult for purposes of Wisconsin's criminal justice code, but still developmentally delayed. About a month after turning seventeen, Jason started getting in legal trouble. Over a six month period beginning in January 1998, Jason was arrested several times, almost all for relatively minor property offenses. Jason and some other kids broke into a shopping mall at night and a closed movie theatre. They stole a car from a car dealership (crashing it within hours), and broke into a garage and stole a fishing pole. These arrests resulted in four separate criminal convictions. Ludke's life up to this point had created some serious obstacles for him to achieve a successful life. Now, at just seventeen, he faced another obstacle: he was a convicted felon on probation.

It's no surprise that Jason failed on probation. To its credit, the probation department gave him several opportunities. But Jason's drug use further reduced his executive functioning and decision-making, and ultimately he stopped reporting to his probation officer. Without other options, his probation was revoked and he was sent to prison.

He didn't acclimate to prison well. Early into his sentence, he was charged and convicted for the 2002 sexual assault. This conviction had significant consequences. Now a sex offender, Ludke was stigmatized within prison. He ended up in segregation, where his mental health deteriorated. It was while in segregation that Ludke discovered Islam.

Up to this point in his life, Ludke was an outcast who found acceptance nowhere. Through Islam, Jason found acceptance and an identity. Islam provided him with a sense of structure he'd never known. But his focus has always been more on the trappings of Islam than on understanding the religion and living a pious life. It's also perpetuated "his early-constructed worldview of being an outsider, set upon by an unfair and unloving world." Ex. A at 17. While his prior federal offense was purported to be committed in "obedience" as a Muslim, it's more reflective of a mentally unstable individual not being properly medicated.

The BOP released Ludke to Green Bay in 2016. But Green Bay didn't want him. While his sex offense stigmatized him in prison, it created real obstacles for his reentry. *See* Exhibit B. He ended up in the BOP's halfway house in Janesville, Wisconsin, the only such facility

---

[2] *Available at*: https://46y5eh11fhgw3ve3ytpwxt9r-wpengine.netdna-ssl.com/wp-content/uploads/2012/05/The-Science-of-Neglect-The-Persistent-Absence-of-Responsive-Care-Disrupts-the-Developing-Brain.pdf

in the state that accepts sex offenders. While the probation office looked to secure more permanent housing upon his completion, the halfway house grew tired and wary of Jason's computer activity. The facility believed that Jason was watching jihadist propaganda and kicked him out. Again, he was unwelcome. He was eventually taken in by a Muslim friend he met in prison, his codefendant Yosvani Padilla Conde. He now had a home, but Padilla-Conde's wife made it clear to Ludke that he couldn't live there permanently.

Ludke was released from Rock Valley on July 29, 2016. He would remain in the community for 68 days. In that time, he was able to obtain employment, working at Wholesale Grocers Depot for about five weeks. He made mistakes on things as rudimentary as stocking the shelves. Two of Ludke's supervisors described him as "mentally slow." While he did not test positive for controlled substances, social media records clearly show that Ludke was routinely smoking marijuana. He also purports to have been using cocaine in the days leading up to his departure from Milwaukee. But he spent most of his time either at the mosque or on social media. It was through social media that Ludke began conversing with undercover FBI agents whose communications facilitated Ludke's arrest.

   a. *Ludke's mental illness, identity complex, and yearning for acceptance render him tailor-made to fall for ISIS's recruitment propaganda.*

The abuse and neglect Ludke endured as a fetus, child, and adolescent have caused trauma that led to many of Ludke's behavioral problems and mental illness. They've also contributed to a lifetime of identity issues. Ludke has claimed, at various points, to be from several different places (Turkey, Cuba, Detroit, and Green Bay). He's claimed different heritages (American Indian) and religions (Catholic, Protestant, Hindu, Sunni, Shia, Jewish, and Rastafarian). He's claimed to have fought alongside Mexican drug cartels against the Mexican Army.

This background, the mental illness, alienation, and identity issues are strikingly common in people drawn to ISIS and their propaganda. According to a report from the Center on National Security at Fordham Law School, many of those accused of trying to join ISIS "had expressed some form of social alienation, loneliness or identity issues." Center on National Security at Fordham Law, *Case by Case, ISIS Prosecutions in the United States: March 1, 2014 – June 30, 2016*. A study of those drawn to extremist ideologies conducted by researchers at Georgetown noted that such people "are likely to suffer from some psychological disturbance, increasing the likelihood of extremist ideologies

resonating." Alfaro-Gonzalez, Lydia and RJ Barthelmes, et al., *Report: Lone Wolf Terrorism* (June 27, 2015).[3] It further noted:

> An individual who has suffered trauma may disassociate himself or herself from his identity and seek alternative worldviews to replace this loss. These new extreme ideologies are frequently grounded in a religion that gives meaning to pain, provides a community and sense of self, and offers a system of behavior and identity, particularly appealing to psychologically traumatized individuals.

*Id*. In this regard, it is not surprising that Ludke fell prey to ISIL's sophisticated and psychologically coercive social media propaganda. *See* Josh Gerstein, *The propaganda war Obama is losing*, Politico (September 9, 2014) (According to Matthew Olson, Director of the National Counterterrorism Center, ISIL "operates the most sophisticated propaganda machine of any extremist group.").[4] That propaganda portrays a welcoming and utopian caliphate alluring to vulnerable individuals like Ludke.[5]

## II. Nature & Circumstances of the Offense

In football, the "pass interference" penalty occurs when a defensive player interferes with a receiver attempting to catch a pass before the receiver touches the ball. However, when the pass is uncatchable, there is no penalty, even if the receiver is attempting to make a catch. This case represents the legal version of the uncatchable pass. The difference of course, is that while the pass being uncatchable negates a foul in football, the offense being un-completable does not negate the foul here. And while the fact that Ludke could not have actually completed the crime he attempted to commit does not negate his guilt, it should lessen the punishment.

The undeniable reality is that Jason Ludke was never going to provide any actual support to a foreign terrorist organization. He may have wanted to. He may have conspired to.

---

[3] *Available at* http://georgetownsecuritystudiesreview.org/wp content/uploads/2015/08/NCITF-Final-Paper.pdf.

[4] *Available at*: https://www.politico.com/story/2014/09/the-propaganda-war-obama-is-losing-110740

[5] *See* Ruckmini Callimachi and Catherine Porter, *Toronto shooting rekindles familiar debate: Terrorist? Mentally Ill? Both?*, N.Y. Times (July 25, 2018) *available at:* https://www.nytimes.com/2018/07/25/world/americas/islamic-state-mental-health.html. The former counterterrorism chief with London's Metropolitan Police has said that ISIL is actively targeting vulnerable people, including those with mental illness. And Australia's national counterterrorism coordinator has said that individuals are drawn to ISIS because of mental health issues that made them susceptible to the terrorist narrative. Some experts have even labeled "lone wolf" type terrorist attacks as "loon wolf" attacks.

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

PAGE 7

He may have attempted to. But he never came close to actually providing any support and lacks the capacity and sophistication necessary to do so. It's also unquestionable that there were contributing influences to his desire to leave Wisconsin and the United States. During his communications with the FBI undercover agents ("UCE"), Ludke repeatedly complained of the oppression he experienced in the United States. He told the agents he was on probation, and when they asked what probation was, he described it as "another system of supervision of taghut." Taghut is an Arabic word describing "earthly tyrannical power."[6]

Unable to find a stable living arrangement and having doors slammed on him at what seemed like everywhere he turned, Ludke just wanted to get out. And to him, travelling overseas seemed like a realistic option, despite there never being any clear plan. Ludke had told people he was going to Iraq, Syria, Yemen, India, Philippines and Brazil. The reality is that Ludke lacked the means, skills, and intellect to get anywhere, much less get out of the country and across the globe to assist a foreign terrorist organization.

Ludke is representative of what some critics have called "national security theatre." Trevor Aaronson, *The Released: More than 400 people convicted of terrorism in the U.S. have been released since 9/11*, The Intercept, April 20, 2017.[7] Press releases and news stories herald the arrests and prosecutions of those accused of aiding terrorists, and help the FBI justify spending over $3 billion a year on counterterrorism efforts. *Id*. But the majority of those prosecuted are a lot like Ludke: "In the majority of ISIS stings, targets were not in direct contact with ISIS representatives and did not have weapons of their own…but were inspired by online propaganda to join ISIS and either made arrangements on their own to travel to Syria or were aided by FBI informants or undercover agents in their attempts to join ISIS." Trevor Aaronson, *The New Targets: FBI Stings Zero in on ISIS Sympathizers. Few Have Terrorist Links*, The Intercept (April 20, 2017).[8] The targets are "aspirational, not operational." *Id*.

Ludke's offense consists of him: 1) telling an FBI undercover he wanted to travel overseas; 2) recording a video, at the UCE's direction, pledging his allegiance to Abu Bakr al-Baghdadi; and 3) driving towards Mexico where he would await further instructions from the UCE. This conduct falls far on the mitigated end of the spectrum in terrorism-related offenses. In *United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886 at *19

---

[6] Wikipedia, "Taghut," https://en.wikipedia.org/wiki/Taghut (last visited February 11, 2019).

[7] *Available at*: https://theintercept.com/2017/04/20/more-than-400-people-convicted-of-terrorism-in-the-u-s-have-been-released-since-911/

[8] *Available at*: https://theintercept.com/2017/04/20/fbi-stings-zero-in-on-isis-sympathizers-few-have-terrorist-links/

(D. Colo. July 18, 2018), the court identified several factors that mitigated a terrorism-related offense. And while *Jumaev* involved financial support, as opposed to "personnel" support, the same mitigating factors are present here:

- Ludke did not attempt to purchase any weapons;
- He had no contact with any members of ISIS;
- He did not associate with terrorists or try to support them while in the U.S. Armed Forces or law enforcement;
- He did not take pictures of US monuments to encourage a terrorist attack;
- He did not buy a ticket to travel anywhere;
- He did not serve in a leadership role of an organization;
- He did not solicit funds from other individuals or attempt to recruit them; and
- His efforts were not organized or methodical.

Ludke claimed he had martial arts training that could assist ISIS. He has no martial arts training. He claimed Padilla-Conde had firearms training. That also is untrue. From the moment he began communicating with the UCE (and likely sooner, given his expulsion from Rock Valley, which the FBI was alerted to), Ludke was under the watchful eye of law enforcement. The FBI knew what he was up to and where he was. He was low-hanging fruit, a primary target of the war on terror. Mike Mariani, *The Would-Be Terrorist vs. the FBI*, GQ (Nov. 20, 2018).[9] The FBI continues to monitor him, even sending informants and undercovers into the jails where he is housed.

The PSR addresses threats Ludke made towards the UCE involved in his case. Ludke's discussion with jailhouse informants isn't much different than his conversations with the UCE. He was looking to fit in. People in jail awaiting trial often talk about getting witnesses to not appear. Ludke didn't know the UCE's name, where the UCE lived or worked or what the UCE looked like. In fact, Ludke's contacts with the undercover and informants shows how Ludke just can't help himself from opening his mouth when he shouldn't. Ludke even told the informant after the informant arranged to have an undercover FBI agent meet with Ludke, that he, Ludke, was worried the person he met with was with the FBI, saying "this is exactly how we got caught last time." Despite his instincts, he continued to talk.

---

[9] *Available at:* https://www.gq.com/story/matthew-llaneza-alleged-terrorist-fbi-snare (Former FBI agent described FBI's approach to terrorism cases as largely targeting "low-hanging fruit," men who are "poor, asocial, and often mentally ill" whose "only hypothetical tie extremists is the FBI, which 'portrays itself as the terrorist group.'").

Other inmates have looked to help their cases by providing information about Ludke. Those conversations reflect that Ludke is either delusional or boasting about how dangerous he is as a means of fitting in. He told one jailhouse informant that his brother-in-law was an ISIS recruiter and that he was in possession of "M60 rifles" when he was arrested. He told another jailhouse informant that he was involved in the "killing of US military personnel by sending emails to radicalized Imams in Yemen." He told the same informant that he and other Muslims "travelled to Mexico to assist the Los Zetas fight a war against the Mexican Army" in Durango, Mexico and that "he also participated in several battles that occurred in other Mexican cities and in the mountain regions."

While it's likely Ludke said these things, they're patently untrue, and support the notion that Ludke says some pretty unbelievable and frightening things. As incredible as his comments may be, they are just words. What's more, they've always proven to be hollow words. When he claims to have done something bad, it's not true. And when he claims to want to do something bad or that he's trying to do something bad, he never follows through and he lacks the ability to actually do them.

There were two things going on simultaneously in this case. On one hand, Ludke became disillusioned with his life as a sex offender on supervised release. The difficulty he faced finding a residence, employment, and acceptance outside of prison stifled him. Ludke then found solace and acceptance in a community he did not, and still does not, fully understand. He was drawn into a rabbit hole of extremism that that Ludke, himself disillusioned, grabbed onto.

His drug use in the weeks leading up to his offense festered some of these beliefs. Ludke eventually got himself so worked up, that he embarked on a journey so improbable and ill-conceived that it could not have possibly worked.

> III. ***The Sentencing Guidelines fail to accurately reflect the nature and circumstances of the offense or the history and characteristics of this defendant and are arbitrarily inflated by a sentencing enhancement that is neither the product of the Sentencing Commission's traditional institutional role nor reflective of the § 3553 factors.***

The sentencing guidelines range in this case is 360 months to life. But because the statutory maximum is 20 years, 240 months becomes the operative sentencing guidelines range. The guidelines arrive at this point due to the 12-level enhancement found in U.S.S.G. § 3A1.4. This enhancement operates much like the career offender guideline: it inflates both a defendant's offense level and criminal history score.

The enhancement increases the offense level by 12 levels. For defendants like Ludke, convicted of providing material support (or more typically attempting or conspiring to do so), that increases the offense level to 38. It also increases the defendant's criminal history to Category VI, resulting in a guideline range of 360 months to life.

Section 3A1.4 applies "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." A federal crime of terrorism is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Under the strict letter of the law, Ludke's conduct falls within the latter. He decided to leave the United States based on perceived persecution perpetrated on him by the government. The question here isn't so much whether Ludke's conduct falls within the definition of § 3A1.4; he concedes it does. Rather, it's whether this guideline, like the career offender guideline,[10] the child pornography guidelines,[11] and many others,[12] fail to represent "the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

### a. U.S.S.G. § 3A1.4 is not a product of the Commission's traditional role.

Prior to 1994, federal offenses involving terrorism fell under U.S.S.G. § 5K2.15.[13] However, as part of the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA), Congress directed the Sentencing Commission to, among other things, create an enhancement for felonies involving international terrorism.[14] As a result, the Commission created Section 3A1.4. Congress has twice directed the Commission to expand the scope of § 3A1.4 since its inception, both in the wake of terrorist attacks. Both the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) (enacted after the Oklahoma City bombing) and the Patriot Act (enacted after September 11, 2001)

---

[10] *United States v. Santoya*, 493 F. Supp. 2d 1075, 1079-80 (E.D. Wis. 2007).
[11] *United States v. Phinney*, 599 F. Supp. 2d 1037, 1041-46 (E.D. Wis. 2009).
[12] *See, e.g., United States v. Tesillos*, 965 F. Supp. 2d 1037, 1040-41 (E.D. Wis. 2013) (Production of fraudulent identification documents); *United States v. Fogle*, 694 F. Supp. 2d 1014, 1017-18 (E.D. Wis. 2010) (firearms guideline).
[13] U.S. SENTENCING GUIDELINE MANUAL § 2K2.15 (1990) ("If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."
[14] Interestingly, Congress's directive sought to exempt offenses that, like the offense of conviction here, had as an element involvement or intent to promote terrorism. VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994, PL 103–322, September 13, 1994, 108 Stat 1796

expanded the offenses to which § 3A1.4 applied. And while the number of offenses to fall within its scope has increased, the penalty structure hasn't.

Interestingly, just before the VCCLEA was enacted, the Commission expressed concern with the rigidity of some of the VCCLEA's penalty enhancements.[15] Nonetheless, the Commission followed Congress's directive, and without any empirical evidence, created § 3A1.4 and its harsh penalty structure. *See United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886 at *10 (D. Colo. July 18, 2018). The result is that virtually all defendants convicted of terrorism offenses are treated identically, regardless of how different their offenses may be:

> The circumstances of individuals convicted of crimes of terrorism (or who intended to promote crimes of terrorism) differ greatly, and sentencing them without crediting those differences results in disproportionate sentences and disparities in sentencing. Some of the distinguishing factors that should be considered are "the 'materiality' of their support, the intent with which they gave the support, the organization to which the support was given, the quality and quantum of the support, the duration of the support, the identifiable harm caused by the support, and any identifiable victim of the support." But the Terrorism Enhancement does not permit consideration of any of those aspects.

*Id*. at *11 (quoting James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3a1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 100 (2010)) D. Colo. July 18, 2018)

What's more, the sentencing range produced by § 3A1.4 exceeds the maximum penalties Congress set for the most routine terrorism offenses. What is the sense in having a crime carry a statutory penalty range of 0-20 years, but have every defendant convicted of that crime to have a sentencing guideline range of 30 years to life? Section 3A1.4 doesn't just treat all people convicted of terrorism offenses the same, it treats them all people convicted of terrorism offenses as the worst terrorists.

---

[15] U.S. SENTENCING COMMISSION, *Analysis of the Violent crime Control and Law Enforcement Act of 1994 (H.R. 2244, as passed by the Senate November 19, 1993, and by the House April 26, 1994)*: Part II at 13 (1994) ("As a general principle, the Commission has opted for a more flexible guideline departure, rather than a fixed guideline enhancement where a sentencing factor is atypical or when it may arise during the course of a wide range of offenses of varying seriousness or in many forms.").

As one district judge noted, § 3A1.4 treats a person who collects $1000 for a terrorist organization but has no contact with the organization the same as someone who maintained direct and continuing contact with a high-ranking member of a that organization and offered the use of his house as a haven for the organization's fighters and to store bombs and other weapons. *Id.* at *10 (citing *United States v. Moalin*, No. 3:10-cr-04246 (S.D. Cal.), Nasir Sentencing Tr. at 18:7-19:8, 25:20-21, ECF No. 468 and Moalin Sentencing Tr. at 50:5-25, ECF No. 449). The enhancement ends up treating Jason Ludke, who pledged his support for ISIS and drove to Texas, but never had any chance of actually assisting ISIS, the same way it treats an ISIS commander who trains fighters or gives them vast sums of money. This result runs counter to the purposes of sentencing and the Guidelines themselves. The Guidelines after all, were created in part to bring "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. Ch. 1, Pt. A.

Ludke asks this Court to reject U.S.S.G. § 3A1.4 on policy grounds. *See United States v. Salim*, 690 F. 3d 115, 126 (2nd Cir. 2012) (recognizing district court's authority to reject § 3A1.4 because it was not the product of Sentencing Commissions institutional role). Like the drug guidelines do without the career offender guideline, the material support guidelines already "calibrate[s] the severity of the sentence to the culpability of the conduct and the harm," while also accounting for the defendant's personal history and characteristics. *Jumaev*, at *11 (quoting McLoughlin, 28 Law & Ineq. at 73).

Put differently, the guidelines already assign an offense level for this type of conduct. They also factor in a defendant's criminal history. So the Court can evaluate the specifics of this case and this defendant under the rubric of the guidelines, without applying the § 3A1.4 enhancement.

Doing so here, the Court must consider Ludke's criminal history. He has 13 criminal history points, so he's already in Category VI. But his criminal history is undeniably overstated. Six of those thirteen points are from a series of relatively minor property offenses from when Ludke just turned 17, over twenty years ago. Over a six-month period in 1998, Ludke was involved in a rash of property offenses. He broke into garages and stole fishing poles and "mini bikes," hid in a department store after it closed and stole some clothing, stole a soft drink from a grocery store, broke into a closed movie theatre and was found with cigarettes. He took a car that was running from a car dealership. These offenses, despite being over 20 years old and committed when he was a juvenile and resulting in probation, amount to six criminal history points.

Ludke submits that a more appropriate way to view his criminal history would be to ignore the rash of 1998 convictions, and place him in Category IV. Then applying the ordinary offense level for a material support conviction, 26, with an adjustment for acceptance of responsibility, Ludke would face a corresponding guideline range of 70-87 months.[16] While that range is more within the realm of reasonableness, it's still excessive in light of the factors enumerated in 18 U.S.C. § 3553(a).

### IV.    The Need to Protect the Community

Protecting the public strikes at the heart of § 3553(a)'s mandate. At first glance, it would seem that Ludke is precisely the sort of person that society wants to be protected from. Terror attacks have led to some of this country's darkest days. ISIS has been responsible for some of the biggest tragedies over the last five years.

Terrorism is the use of intentionally indiscriminate violence, or the threat of it, as a means to create terror or fear among masses of people. It scares people, for good reason. As scary as the idea of Jason Ludke, who sought to support ISIS, walking the streets of their community may be to some, the truth is that Jason Ludke has never engaged in violence. Over the last 15 years, his history is filled with him saying inappropriate things, as opposed to doing inappropriate or violent things.

Ludke anticipates the government arguing that he might commit a crime or terrorism offense in the future, and that the public needs to be protected from that. But as Judge Kane noted in *Jumaev*, the Court cannot sentence a terrorism defendant "on an unfounded fear that he might do something" in the future. *Jumaev*, at 16. Rather, the Court "must look at what he actually did and determine whether it is likely that he will do something similar or greater in the future." *Id*. While it's likely Ludke will say something inappropriate in the future, he's demonstrated that it's unlikely he'll actually act inappropriately.

---

[16] Ludke notes that the PSR recommends a two-level obstruction enhancement and a two-level enhancement for engaging in conduct intended to result in an act of violence. PSR at ¶¶ 28, 31. Because those enhancements don't change the ultimate guideline range (the § 3A1.4 enhancement places his guidelines range is over the 20-year maximum with or without them), Ludke has not objected to them. However, for this exercise the Court may wish to consider the appropriateness of these enhancements. Ludke submits that neither should apply. The obstruction enhancement is based on Ludke suggesting, while he was a pretrial detainee, to an FBI undercover, that he wanted the undercover to do something to another FBI undercover, whose name and location he didn't know and couldn't provide. As to the § 2M5.3(b) enhancement, there is no evidence in this case that Ludke intended to commit or assist in the commission of a violent act.

### a. The importance of supervised release

While Ludke never posed an actual threat to the public, the public can take some solace in the fact that Ludke was monitored as closely as he was during his offense. Had he had the ability to actually aid ISIS, authorities would have known that. This fact underscores an obvious point: further monitoring of Ludke is imperative to ensure that he doesn't commit crimes in the future. And while it's likely that the FBI will continue to monitor Ludke, both while he's in prison and once he's in the community, that level of monitoring can continue without an active FBI investigation.

In other material support cases, judges have imposed special supervised release conditions that are tailored to defendants who, like Ludke, might be more susceptible to extremism. For example, in *United States v. Khan*, 14-cr-564 ECF No. 101 at 6-7 (N.D. Ill. November 21, 2016), the court ordered the defendant to "attend violent extremism counseling" as a condition of supervised release.[17] It also ordered him to comply with a computer and internet monitoring program. Such programs can monitor all devices a person has access to and amongst other things, "may restrict and/or record any and all activity on the computer [or device], including the capture of keystrokes, application information, internet use history, email correspondence and chat conversations." *Id*. The court also authorized a search condition of all electronic devices, email accounts, social media accounts and instant messaging accounts, up to four times per month.

Ludke submits that monitoring of this sort, while highly intrusive, will provide public protection and deterrence much more effectively than warehousing him would. This level of monitoring will inform the probation office what he's up to and what's on his mind, in real time. It also does so in a much more cost-effective but constitutionally-less-intrusive manner than incapacitating him.

### V. The Need to Avoid Unwarranted Sentencing Disparities

As indicated above, the guidelines treat all defendants convicted of terrorism-related offenses as the worst terrorists. But many district courts have rejected these guidelines and imposed sentences tailored to the specifics of the case. And while it's unlikely that many defendants bring the unique personal circumstances to the sentencing table that Ludke brings, several bring similar offense-related circumstances.

---

[17] Judgment attached as Exhibit C.

PAGE 15

The following cases involve defendants accused of attempting to provide material support (in the form of personnel) to ISIS, and traveled or attempted to travel overseas.

| Defendant | Case # | District | Sentence | Facts |
|---|---|---|---|---|
| Joshua Van Haften | 15cr37 | W.D. Wis. | 120 months | Travelled to Turkey on way to Syria to fight with ISIS. |
| Mohammed Khan | 14cr564 | N.D. Ill. | 40 months | Khan, who was actually recruited by ISIS and had direct contact with the organization, was arrested boarding a flight to Turkey to join ISIS. |
| Avin Brown | 14cr58 | E.D.N.C. | 92 months | Arrested at airport with a ticket to Turkey to fight with ISIS. Received weapons training from his co-conspirator, Akba Jordan. |
| Akba Jordan | 14cr58 | E.D.N.C. | 18 months | Jordan provided weapons training to Avin Brown and told an FBI informant that he wished to fight nonbelievers both in America and overseas. When police searched his home, they found a bulletproof vest, an AK-47, swords, and other weapons. |
| Abdullahi Yusuf | 15cr46 | D. Minn. | Time Served (approx. 12 mos.) | Planned to travel overseas to support ISIS. |
| Aaron Daniels | 16cr22 | S.D. Ohio | 80 months | Expressed an interest in joining ISIS and sent money to an ISIS recruiter. Told an undercover he wanted to fight with ISIS in Libya, but planned to travel to Trinidad & Tobago first so he couldn't be tracked by US authorities. Arrested boarding a flight on way to Trinidad & Tobago. |
| Hamza Naj Ahmed & Zacharia Yusuf Abdurahman | 15cr49 | D. Minn. | 120 months each | Flew to NY on way to Turkey to fight with ISIS. |
| Nicholas Teusant | 14cr87 | E.D. Cal. | 144 months | A member of the national guard, Teusant was arrested on his way to Canada to get overseas to engage in violent jihad on behalf of ISIS. He had earlier told an FBI informant that he wanted to be involved in a bomb plot in the United States. |
| Gregory Hubbard | 16-cr-80107 | S.D. Fla. | 144 months | Told an FBI informant he wanted to travel to Syria to join ISIS. Introduced Dayne Christian and Darren Jackson, who also wanted to travel to joint ISIS, to the informant. |
| Darren Jackson & Dayne Christian | 16-cr-80107 | S.D. Fla | 63 months | Both provided weapons training to Gregory Hubbard and an FBI informant who planned on travelling to Syria to join ISIS. |

| Mohamed Jalloh | 16cr163 | E.D. Va. | 132 months | Former member of US Army National Guard, told FBI informant he wanted to help ISIS and discussed launching an attack in the United States. He also wired $500 to who he thought was an ISIS member. |
|---|---|---|---|---|
| Islam Natsheh | 16cr166 | N.D. Cal. | 60 months | Natsheh came to FBI's attention sharing ISIS propaganda online. He was interviewed, and claimed he no longer had those views. The FBI discovered that he had purchased a plane ticket to Turkey and police arrested him in San Francisco as he was boarding a plane to Turkey. |
| Joseph Farrokh | 16cr20 | E.D. Va. | 90 months | Corresponded with FBI undercover agents and planned to travel to Syria to join ISIS. He was arrested at the airport travelling overseas. |
| Jaelyn Young | 15cr98 | N.D. Miss. | 144 months | Planned to travel to Turkey with her fiancé (Dahlalla) to join ISIS. Was a medical student and offered her medical training as a benefit on the battlefield. Admitted plans to undercover FBI. Arrested boarding a flight on way to Turkey. |
| Muhammad Dahhlalla | 15cr98 | N.D. Miss. | 84 months | Planned to travel to Turkey with her fiancé (Young) to join ISIS. Admitted plans to undercover FBI. Arrested boarding a flight on way to Turkey. |
| Nader Saadeh | 15cr618 | D.N.J. | 120 months | Booked flight to Jordan as part of plan to travel to Turkey to join ISIS. Travelled to Jordan where he was arrested. |
| Samuel Topaz | 15cr450 | D.N.J. | 84 months | Conspired with Nader Saadeh to travel to Turkey and Syria to join ISIS. |
| Asher Khan | 15cr263 | S.D. Tex. | 18 months | Attempted to travel to Syria to join ISIS. Khan actually travelled to Turkey but returned to the United States before crossing into Syria. |
| Keonna Thomas | 15cr171 | E.D. Pa. | 84 months | Distributed ISIS propaganda online. Married an ISIS recruit in Syria via Skype. Planned to travel to Syria to join ISIS and purchased flight to get there. |
| Marchello McCain | 15cr174 | S.D. Cal. | 120 months | Planned to travel with his brother to Syria to join ISIS. Prepared for trip by practicing shooting guns at a gun range, and purchased a plane ticket. His brother did travel to Syria. |
| Daniela Greene | 14cr230 | D.C. | 24 months | Greene was an FBI linguist assigned to investigate Denis Cuspert, a German rapper who became a recruiter for ISIS. Greene flew to Turkey and then went to Syria, where she married Cuspert. Regretting her decision, she returned to the United States. |
| Adam Dandach | 14cr109 | C.D. Cal. | 180 months | Communicated with members of ISIS and was arrested trying to board a plane to Turkey. He made false statements to obtain a new passport. |
| Michael Wolfe | 14cr213 | W.D. Tx. | 81 months | Worked with an undercover FBI informant to arrange travel to Syria. |

| Donald Morgan | 14cr194 | E.D.N.C. | 243 months | Morgan sold an AK-47 to an ATF informant. Investigation into Morgan revealed he had posted ISIS propaganda on social media. He also travelled to Lebanon on his way to Syria to join ISIS, but was stopped in Turkey. He was arrested when he returned to the United States. |
|---|---|---|---|---|
| Shannon Conley | 14cr163 | D. Colo. | 48 months | Conley planned to travel to Syria to work as a nurse in an ISIS camp. She was arrested after boarding a plane to Turkey on her way to Syria. |

In most respects, each of these offenses were more egregious than Ludke's. Each took greater steps to join ISIS. Many sent money, obtained weapons, or received training. Some actually communicated with ISIS members and recruiters. Some had military or police training. Many expressed an interest in engaging in violence or jihad. Most, if not all, purchased plane tickets. Many actually travelled overseas. Ludke did none of that. The majority of these defendants were also subject to the U.S.S.G. § 3A1.4 enhancement, yet very few received a sentence of the type the guidelines recommended.

### VI. Conclusion

This case involves a complex individual with significant mental health and cognitive issues and a unique set of circumstances. Ludke stands charged with attempting to provide material support to a foreign terrorist organization. America's war on terror is a national security issue and the laws and sentencing guidelines treat it as such. But Ludke is no national security threat. He's a mentally ill and cognitively impaired lost soul from Green Bay. He survived an unimaginable childhood that didn't prepare him for the real world. As a result, he's been incapacitated for almost his entire adult life. That background has contributed to a sense of isolation and an identity complex that drew him to Islam. He hasn't conformed to society's expectations, and has used his voice and his pen to rebel, usually in a misinformed and misguided way. While his words have been alarming, they have never been backed up or supported by actual violence. In sum, Ludke talks the talk, but he doesn't walk the walk.

He asks the Court to impose a sentence of 60 months. Such a sentence, along with a period of supervised release with special conditions tailored to his needs and risks, reflects the unique nature of this case and accomplishes the purposes of sentencing.

Sincerely,

*/s/   Joshua Uller*

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.

*/s/     Tom Phillip*