UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Case No. 16-CR-175 & 09-CR-222 |
| vs. | ) | Milwaukee, Wisconsin February 26, 2019 |
| JASON LUDKE, Defendant. | ) | 11:00 a.m. |

---

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff UNITED STATES OF AMERICA: | United States Department of Justice<br>By: Benjamin P Taibleson<br>Office of the US Attorney<br>517 E Wisconsin Ave - Rm 530<br>Milwaukee WI 53202<br>Ph: (414)297-1727<br>Fax: (414)297-1738<br>benjamin.taibleson@usdoj.gov |
| For the Defendant JASON LUDKE: (Present) | Federal Defender Services<br>By: Joshua Uller & Thomas Phillip<br>517 E Wisconsin Ave - Rm 182<br>Milwaukee WI 53202<br>Ph: (414)221-9900<br>Fax: (414)221-9901<br>Josuha_uller@fd.org |
| U.S. Probation Office: | Daniel Dragolovich |
| U.S. Official Reporter: Transcript Orders: | SUSAN ARMBRUSTER, RPR, RMR,<br>Susan_Armbruster@wied.uscourts.gov |

Proceedings recorded by computerized stenography, transcript produced by computer aided transcription.

THE COURT: 16-CR-175 and 09-CR-222, U.S. versus Ludke. Appearances, please.

MR. TAIBLESON: Good morning, Your Honor. Benjamin Taibleson for the United States.

PROBATION AGENT: Dan Dragolovich for U.S. Probation.

MR. ULLER: Good morning, Your Honor. Jason Ludke appears in person with Joshua Uller and Thomas Phillip.

MR. PHILLIPS: Good morning.

THE COURT: Okay. We're here for sentencing and a revocation. The defendant previously pleaded guilty to Count 1 of the Indictment in the new case, but it appears the violations set forth in the November 16, 2016 Updated Revocation Hearing Report haven't been formally adjudicated. Mr. Uller, I assume your client admits the three violations in that report?

MR. ULLER: Yes.

THE COURT: And Mr. Ludke, you've gone over this hearing report dated November 16th with your client, I mean, with your lawyer; you understand the violations; and if you wanted to have a hearing, you could; and you could present evidence and witnesses and question adverse witnesses, and you could have your lawyers there. I'd appoint a lawyer, if necessary.

And if I find you violated your release terms, I could revoke your supervision, put you in prison up to two years and re-impose supervised release up to three years less any period

of imprisonment. Understanding these rights, you admit the alleged violations?

DEFENDANT: Yes.

THE COURT: And nobody's threatened you or promised you anything to get you to admit them?

DEFENDANT: No.

THE COURT: All right. I find the defendant has knowingly and voluntarily admitted the violations as alleged, and I assume both sides agree that revocation is required. And given that, I'll find that you violated your release terms, that revocation is really the only realistic alternative, so I'll revoke supervised release as of today.

And if nobody objects to the guideline calculations, they are Grade A, Criminal History VI, 33 to 41 months range with 24 months statutory maximum, and one to three years supervised release less any period of imprisonment. And then there's a $50 assessment, which is an unsatisfied condition.

And then on the new case, Mr. Uller, you've gone over the presentence with your client, I assume?

MR. ULLER: Yes, Judge.

THE COURT: And do you have any objections to anything?

MR. ULLER: No.

THE COURT: And you waive full reading of supervision conditions?

MR. ULLER: We do, Your Honor.

THE COURT: And the Government, any objections?

MR. TAIBLESON: No, Your Honor.

THE COURT: All right. Then, I'll adopt the facts in the P.S.R.. The guidelines are Level 39, Criminal History VI, 240 months range, two years to life supervised release, 50,000 to 250,000 fine, $100 assessment.

And if we're ready to proceed to sentence, Mr. Uller, I'll hear from you and/or your client, and then I'll here from Mr. Taibleson.

MR. ULLER: Thank you, Judge. Ordinarily, I wouldn't submit 50 pages of materials to a Court in advance of sentencing. I think doing so in this case is important. While the Government doesn't really draw a distinction, the reality is that not all terrorism cases are the same.

There are cases where defendants are actual terrorists and inflict or try to inflict mass pain and suffering and fear. And then there are cases like this where people like Mr. Ludke who were, perhaps, sympathetic to an ideology, get caught up in a moment of relatively, I will concede, waywardness. This case is the later. And Mr. Ludke while certainly not a saint is not a terrorist. He's not a threat to national security.

Looking at the conduct he engaged in in this case, he never talked about violence. He never talked about Jihad or killing people.

Many of ISIS's attacks have been domestic acts of really random violence. We look at the post-nightclub shooting in Orlando; San Bernardino shooting in California, attacks in Manchester; Nice, France. These were crimes committed by people with a will to hurt other people, and that's not who we're dealing with.

Every indication is that Jason Ludke, like so many other disillusioned people, was drawn to this idea of a utopian caliphate. We're, obviously, dealing with someone who's mentally ill.

The story of how Jason Ludke became who he is and as mentally ill as he is is as sad as any I've seen. I understand he's not someone that most people look at and feel that he's a sympathetic figure. I find it impossible not to feel sympathy for him. He was abused as a fetus and born into this unwelcome and harmful environment. He didn't stand a chance in life. He was physically and emotionally abused, neglected at unprecedented levels.

So it's not really a surprise that within months of becoming an adult, for purposes of Wisconsin's criminal justice system, he was branded a criminal. It's not a surprise that once he was in the criminal justice system, he was imprisoned. And it's not a surprise that given his low functioning, he couldn't get out of the system's grip.

In its sentencing memorandum, the Government claims

that both Ludke's offense and his record could hardly be worse. That's just not true. I'm not going to justify his crime. Mr. Ludke doesn't justify his offense. But the suggestion that this is a serious offense possible is preposterous.

As to his criminal record, we've submitted that his criminal record is overstated. And the reality is that the Court, this Court, sees people with worse criminal records on an almost daily basis.

It comes down to the fact that Mr. Ludke had some significant limitations, and we can understand why. His crimes are manifestations of those limitations. He doesn't know how to cope, and he doesn't know how to express himself. He ends up saying some crazy things that understandably scare people, but the vast majority of those things are nothing more than hot air.

The Government says that Mr. Ludke hates non-Muslims. Jason Ludke doesn't hate anybody. He's worked effectively with this Jewish lawyer for over two-and-a-half years. He's worked effectively with Mr. Phillips for almost ten years. He may have some gripes with U.S. policies, and he has a complex as a political prisoner. But I can understand why Mr. Ludke feels that way. He's struggled his entire life to assimilate.

It's an identity that he's really imparted on himself. He's a complicated person, Judge. And the goal of sentencing isn't trying to make sense out of him. The goal is to determine whether he's a danger of harming other people, and he has a

40-year track record of not doing so. It's just not who he is. He doesn't just lack the capacity or wherewithal to hurt people. He lacks the sophistication to do so in a manner that the Government believes he's a threat.

He's likely in the future undoubtedly to say something stupid. He's likely to say something that's going to scare people, but the bottom line is that he's unlikely to engage in violence in the future because he's never engaged in violence thus far.

For -- Based on all the factors and the sentencing memorandum that we've provided to the Court, the social history we provided to the Court, the presentence report, factors under 3553, Your Honor, a sentence of five years in this case is sufficient but not greater than necessary.

There are few, I guess, logistical things that we're asking for. We're asking that he be designated to the Mid-Atlantic Region within the Bureau of Prisons. We're asking that the address on the judgment be a family member's address in that region, and that's to facilitate a smoother release than he dealt with during his last period of release. That address is 438 South Spencer Road in Campton, Kentucky, Zip Code 41301. And we're also asking that the judgment include, as the Indictment does, under his name his A.K.A., and that's Muhammad Abdun Nassir.

Judge, we're asking in addition to the five-year

sentence that the Court imposes in -- in the new case, the 16-CR-175, we're asking for the supervised release conditions that in addition to what's in the presentence report, the special conditions that we've identified in the defense's sentencing memorandum. Those also go to great length to minimize the danger that Mr. Ludke's presence in the community might hold.

Finally as to the revocation, we're asking that the Court impose a two-year sentence in that case and run it concurrent to the sentence it has imposed on 16-CR-175. The Government has indicated to us it doesn't take a position on whether the revocation be concurrent or consecutive, so we're asking the Court run it concurrent given the overlapping conduct between the two matters. Thank you, Your Honor.

THE COURT: So what's the name of that town in Kentucky again?

MR. ULLER: Campton, C-a-m-p-t-o-n.

THE COURT: What's the Zip Code?

MR. ULLER: 40301.

THE COURT: I don't quite understand this address business. That's -- that's -- You want that address on there, is that the idea on the -- on the charges? I mean, isn't this sort of what, kind of a technical matter?

MR. ULLER: Yeah, I think it's to -- When the Bureau of Prisons -- If the address listed for him is a Green Bay

address, which it currently is, his release will be processed through Green Bay. And given the concerns about, you know, Green Bay's sex offender limitations, you know, Mr. Ludke spent his community time in Green Bay living in the county jail.

THE COURT: Okay. What's the -- What's this A.K.A.? It's Michael?

MR. ULLER: Muhammad Abdun, A-b-d-u-n, Nassir, N-a-s-s-i-r. I believe it's on the Indictment.

THE COURT: Okay.

MR. ULLER: Mr. Ludke, Judge, over the course of after his previous sentencing, he submitted several requests to the Court to amend the judgment to include that name. I guess I'm sort of hoping to preemptively have the judgment reflect that largely to -- for both his sake, but also so the Court may not have to deal with repeated pro se requests to -- to modify things.

THE COURT: The second name is A-b-u-d, is that it?

MR. ULLER: A-b-d-u-n.

THE COURT: All right.

MR. ULLER: It's listed in the revised presentence report on page 2.

THE COURT: All right. Does your client want to say anything?

MR. ULLER: I believe so, Your Honor.

DEFENDANT: Judge Adelman, I take responsibility for

my actions. I know I messed up, man. And I did a lot of things irrationally. I don't want to sit here, like, and recite you a bunch of empty excuses that I imagine you've probably heard over all the years. My attorney's kind of summarized a lot of my issues going on, and I apologize to you, man. I apologize to Mr. Taibleson and the Government for me being inicolated (sic) as propaganda, things on line. And it just got to, like, disillusioning my whole vision about our problems in life, and it skewed my whole world.

And this time has really let me sit down and kind of evaluate how irrational I was acting out there, and I just fell into a big downward spiral, man, and it just went out of control. So with that, I apologize, man, and I accept my punishment, you know.

THE COURT: Okay. Thank you.

MR. TAIBLESON: Thank you, Judge. As Your Honor knows, it is rare for our office to recommend a statutory maximum term of imprisonment. I never have until today. But a statutory maximum term of imprisonment is necessary here. It's necessary here because Jason Ludke has spent the last 20 years proving that if he is not in prison, he's hurting or trying to hurt or terrorizing other people.

I'm going to say a little bit about his offense of conviction, his relevant conduct, his criminal history by way of getting at the nature and circumstances of the offense, and the

history and characteristics of the defendant.

His offense of conviction is about as bad as it gets. ISIS circle when he was trying to join was wholesale slaughtering people. As the supreme court says, the material support statute is on its face about preventing attacks. This is not about an attack itself, of course, or otherwise we'll be dealing with a very different situation with respect to the statutory maximum and the Government's approach here.

It doesn't mean it's not real. It is not theater. It was very real. Mr. Ludke was not just a teenager mouthing off in an on-line discussion board. He went to great lengths. He's a man in his mid-30's who went to great lengths to try to join ISIS, cutting off the bracelet he was wearing because he was on federal supervision, and traveling over the course of days to Texas to try to cross to Mexico to try to fly to the Middle East to join ISIS.

You know, a bank robber who might have a momentary lapse in impulse control for 15 minutes might commit a bank robbery. This was days of him very intentionally trying to get to the border so he could fly to the Middle East.

The history of characteristics of the defendant. He's a Category VI even without the terrorism enhancement. That is an astonishing achievement for someone who has only spent a matter of months out of custody in the last 20 years.

His criminal history includes, as Your Honor is aware,

sexually assaulting a little girl, threatening to kill Chief Judge Griesbach, threatening to kill Judge Griesbach's family and his staff. That is why he's a Registered Sex Offender because he sexually assaulted that little girl when he was in his twenties.

He argues that his property crimes are petty. They include stealing a car. It's a fairly serious offense. There's no doubt that Mr. Ludke had an awful childhood and is deserving of our sympathy, and that is relevant to the extent that it affects Your Honor's interest in retribution when choosing a sentence, which I can candidly probably is not a primary motivator in this courtroom in any event.

Okay, maybe he is deserving of our sympathy and so deserves less retribution because his childhood rendered him such that he cannot control himself from behaving this way. If that is right and he cannot control himself, he cannot stop himself from doing things like sexually assaulting children and trying to join ISIS and threatening to kill judges and their families, then he must be incapacitated. He must be in prison, if all that is right.

Relevant conduct. If we were to draw up ex-ante, the worst possible relevant conduct a defendant could commit after being incarcerated for trying to join ISIS, we might imagine that he tried to kill the F.B.I. agent who stops people from joining ISIS, and that is what he did. He attempted through

sending multiple letters through other inmates, through meeting with an undercover source, to have an F.B.I. agent murdered. His response to being stopped from joining ISIS was not contrition. It was a new attempted murder.

There may be cases where it makes sense to vary, for policy reasons, from the terrorist enhancements. This is not it. Multiple courts have said that the variety of material support in which an individual attempts to join an organization himself is, perhaps, the most aggravated version of this offense, worse than just giving money.

The Government submits he is a relatively aggravated offender. Again, he was not arrested in his basement where he was posting mean language on line. He traveled across the entire country after cutting off his supervision bracelet to do this. The worst possible offense of conviction. The worst possible criminal history. The worst possible relevant conduct.

It is a tragedy that a 240 month sentence is necessary here. It is absolutely necessary here to stop him from hurting people. The Government also submits that a life term of supervised release is necessary thereafter. Thank you.

THE COURT: Okay. Thank you. Okay. I considered the 3553(a) factors, which include the nature and circumstances of the offense, history and characteristics of the defendant, the needs of the public and any victims, the sentencing guidelines and policy statements and the avoidance of unwarranted

disparity.

I must then impose a sentence sufficient but not greater than necessary to comply with purposes of sentencing, which are just punishment, deterrence, protection of the public and rehabilitation of the defendant.

As to the nature of the offense. In September 2016, an F.B.I. undercover employee received a friend request from the defendant who was using the name Abuz Sayyaf on social media, and the undercover employee accepted the friend request and thereafter had a private conversation with the defendant during which defendant stated that he is from the United States and wanted to make hijdra, which is migration away from darul kufr, the land of the infidel.

On September 28, 2016, the defendant had another private conversation with the undercover employee during which he stated he was making plans to come there but was traveling first to Mexico. And defendant said he had family in Mexico, and he'll be able to purchase papers to travel.

The defendant and the undercover employee exchanged e-mail addresses, and the defendant sent two pictures of himself to the undercover employee's e-mail address. The defendant told the undercover employee that he had training in jiu-jitsu and computers, which defendant believed would be a benefit to ISIS once he joined.

The defendant also stated that his co-defendant,

Yosvanni Padilla-Conde, had received firearms training while in the Cuban military, and that defendant believed that Padilla-Conde's firearms training would benefit ISIS.  Both of those statements appeared to have been false.

On September 28th of 2016, the defendant had a voice chat with the undercover employee and said that he had a brother-in-law in Mexico who can help them get from the United States and into Mexico.  And the undercover employee asked the defendant to wait for further instructions before making any attempt to leave the United States.

The defendant agreed to wait while the undercover employee consulted with persons who can help defendant get into Raqqah, Syria and then into Mosul, Iraq.  The defendant uttered the Islamic creed, pledged his allegiance to the leader of ISIS, stated that he wants to live under Shariah law, that he rejects tyranny and Kuffar, which is infidels, and that he believes in Al-Wala'wa Al-Bara', love Muslims and hate infidels for Allah's sake, and that he is ready to make Hijrah, migration, to join ISIS as he knows they are on the path of Haq, which is truth.

On September 29, 2016, the defendant sent a video to the U.C.E. in which he made similar statements.  Later on October 1, 2016, the defendant appeared in a video recorded and sent to the U.C.E. by the co-defendant in which the co-defendant swore allegiance to ISIS and expressed his intent to travel to the Middle East to join ISIS.  In the second video, defendant

supports and endorses this co-defendant's intent to join ISIS.

On October 3, 2016, the undercover employee got an e-mail from the defendant saying, "Brother we making Hijrah so just update me if ikhwan have brothers Mexico I can talk to for help. Was salaam."

Two days later, the U.C.E. or undercover employee, I should say, conducted an on going e-mail conversation with defendant and defendant informed the undercover employee that he was traveling in Texas and was on his way to El Paso. The defendant stated that his brother-in-law, a Palestinian Muslim, advised that he go to El Paso in order to cross into Mexico.

On October 5, 2016, law enforcement located defendant and Padilla-Conde in San Angelo, Texas heading southwest -- I'm sorry -- southeast towards the Mexican border. The defendant was arrested on an outstanding warrant from Milwaukee for violating his supervised release, which he was on for this conviction for writing threatening letters to Judge Griesbach. And he'd been on GPS monitoring, but he cut off his bracelet before leaving Wisconsin on route to Mexico.

And then on June 5, 2017, the F.B.I. got information via the U.S. Marshal Service that defendant, while detained on the instant offense and on revocation of the supervised release, was attempting to initiate a plot to kill the undercover employee. Specifically, he was trying to get fellow inmates to send letters out of the jail for him and to make phone calls to

outside parties for him with the aim of convincing outside parties to utilize social media to arrange for this homicide.

On June 15, 2017, the F.B.I. took possession of two letters that defendant gave to a fellow inmate at the Dodge County Detention Facility. The defendant asked him to send the letters to someone on the outside on defendant's behalf. But instead of doing that, the inmate turned the letters over to law enforcement. In one letter, defendant says he got busted because a fake Muslim on line had set him and his co-defendant up. The letter included a name for the targeted undercover employee and said to the reader, "You know what to do." The letters further instruct the reader to destroy his or her phone status and sims card after receiving the letter. The letter -- That letter bears the signature Abu Syyaf and is dated January 20, 2017.

The F.B.I. also obtained an audio recording of a conversation between the defendant and a face-to-face visitor, which occurred at the Dodge county facility on September 6, 2017. Although defendant and the visitor used coded language during the conversation, investigators believe it is apparent that they are discussing a plan to kill the undercover employee.

In a statement to the presentence writer, the defendant cited, "I admit that in approximately September 2016, I began communicating with individuals I thought were associated with ISIS. I admit that I conspired with my roommate,

Padilla-Conde, to try to go overseas to join the ISIS group. I am sorry. I apologize for my irrational behavior, and I accept responsibility for my poor decisions and irrational decision making."

According to the defense, the brother-in-law referred to in the offense conduct, who was the individual that the defendant planned to meet in Mexico, was the ex-boyfriend of the defendant's sister, and that person had previously been deported from the United States.

So turning to the character of the defendant. He's 38. He's got a lengthy record dating back to 1998 as set forth in Paragraphs 39 to 47 of the P.S.R.. Earlier matters involved thefts and burglaries. But more seriously in 2002, he was convicted of second degree sexual assault of a child arising out of an incident in which he gave a 14 year-old girl vodka so that he could take advantage of her sexually.

In 2010, the defendant was convicted of mailing threatening communications based on letters he sent from the Brown County Jail threatening to kill Judge Griesbach and his staff and bomb the courthouse. When authorities searched his cell, they found several letters addressed to other federal judges which contained similar threats.

In June 2009 prior to the letters being sent, the defendant had been interviewed by an agent from the F.B.I. regarding a bank robbery. The defendant told the agent he was

planning to renounce U.S. citizenship and join Hizballah group in Iran. He further stated that prior to that term of incarceration in the Brown County Jail, he had bought guns, explosives and bullet proof vests in order to rob a bank, the proceeds of which he would use to establish a Muslim community to target the United States government, specifically to bomb federal offices and army recruiting centers.

Investigators interviewed a number of other individuals in regard to the defendant's statement about purchasing explosives, firearms and bullet proof vests, and they were unable to find any evidence that he'd actually done any of these things.

Defendant's federal prison term for the threat case began when his state prison term ended on November 22, 2013. Prison records show that defendant recorded no disciplinary violations while he was in federal prison. He was placed in a halfway house in November of 2015, and he was found in possession of a cell phone, which had nude photographs. And shortly thereafter in January of 2016, he absconded from the facility, and he was apprehended three days later, and he was put in the Brown County Jail until he was released in March of 2016.

And then in March of 2016, the court added a condition requiring 120 days at a residential re-entry center due to defendant's earlier termination from the halfway house in order

to assist with his re-entry. The defendant obtained employment at Tufco Technologies in Green Bay.

On April 6, 2016, he failed to report back to the facility after his work shift at Tufco ended. He reported the next morning in violation of his schedule. And then on April 30th, he reportedly became angry while working his shift, and he walked off the job and then he failed to report back to the facility and he absconded from supervision. And then he was apprehended by a Fugitive Task Force on May 12th of 2016.

Then on June 2016, he appeared before the court for revocation hearing, and he was continued on supervised release with the condition that he reside up to 180 days in the Rock County -- I'm sorry -- the Rockey Valley Community Program Transitional Housing Facility.

On July 26, 2016, the condition was further modified holding the remaining time in abeyance and imposing GPS monitoring for up to 180 days. And then he was placed on GPS monitoring the next day and he had some violations for being out of range for short periods of time and he didn't submit activity logs and he traveled to unauthorized addresses twice.

But then on October 2nd, he -- That's when he removed his bracelet without permission and he absconded and then nobody knew where he was, and he was arrested in Texas as I've described on October 5th. And so these violations form the basis for the revocation on the '09 case.

So the presentence report and the defendant's social history report describe defendant's very difficult childhood. He lived with his mother to the age of five when he was placed in foster care due to his mother's substance abuse issues and her neglect. The defense reports details the numerous -- The defendant's report details the numerous instances in which the authorities were contacted.

When the defendant was eight, he went to live with his father. His father, apparently, didn't drink or use drugs, but he was physically abusive. According to the defendant's sister Jennifer, their father started kicking the defendant out of the house when he was under the age of ten. The father would tell the defendant, "I fucking hate you, I wish you were dead." Sometimes when the father kicked the defendant out, he would go stay with their mother, but the mother -- her alcohol abuse would continue. And that the father, according to the sister Jennifer again, the father frequently beat both her and Jason.

Defendant's mother died in 2017. And his father indicated that the defendant isn't a terrorist, that he believes his son's conversion to Islam was a result of being incarcerated for so long. The father theorized that the son might hate the United States because the amount of time he's been in prison. He added that his son was in prison for most of his life. And when he was in the community, he struggled to find a place to live because he had the sex offender tag based on the previous

incident.

Despite this, he believed that his son did well in the community for a while noting that he was able to maintain some type of employment. Defendant's father further stated that defendant had a difficult childhood, and his mother was an alcoholic.

Defendant has no children. He's not involved in a relationship. He denied being involved in a relationship prior to his arrest for the instant offense. He hopes to live with his maternal aunt, Linda Hall, in Kentucky when he's next released from prison.

So there are definite correctional treatment needs here including mental health discussed in Paragraphs 74 through 76 of the presentence. The defendant also has substance abuse issues, mostly marijuana, as indicated in Paragraphs 80 through 86. The defendant did get a high school equivalency degree in 2005, and he completed some programming in state and federal prison as indicated in Paragraph 88. But his work record in the community is pretty limited, which isn't that surprising given how much time he spent in custody.

The guidelines default to 20 years, which is what the Government recommends. Let me first address the guidelines recommendation, and then I'll turn to the 3553(a) factors and the specific arguments of the parties.

In cases relating to federal crimes of terrorism,

guideline 3A1.4 requires that the offense level be increased by 12. And if the resulting level is less than 32, that it be increased to 32. The guideline further provides that the Criminal History Category be deemed six regardless of the defendant's prior record. This means that a defendant in a 2339B case will face a guideline range of 360 months to life, well in excess of the statutory maximum of 20 years regardless of what he specifically did and regardless of whether he has no prior record or a terrible record.

In this sense, guideline 3A1.4 resembles the Child Pornography Guideline, which has been roundly criticized by the courts in that it recommends sentences near or above the maximum even in mine-run cases. This is contrary to the purposes of sentencing in 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worse offenders and those who are less dangerous. See *United States v. Dorvee*, D-o-r-v-e-e, 616 F.3rd 174 at 186-87, (2nd Cir. 2010).

As the one court has noted in discussing this guideline, material support cases can involve a wide range of conduct. Yet guideline 3A1.4 results in a nearly identical guideline range in each case regardless of the underlying conduct. *U.S. v. Jumaev*, J-u-m-a-e-v, 2018 U.S. District Lexus 119, 916 at 28-29 (D. Colo. July 18, 2018). As the *Jumaev* court further noted, this guideline was enacted pursuant to a

congressional directive. And absent the empirical evidence, such guidelines do not exemplify the commission's exercise of its characteristic institutional role, see *Kimbrough, K-i-m-b-r-o-u-g-h, v. United States*, 552 U.S. 85 at 109, (2007), and are generally entitled to less respect, see *United States v. Reyes-Hernandez*, 624 F.3rd 405 at 418, (7th Cir. 2010), *United States v. Tesillos*, T-e-s-i-l-l-o-s, 965 F.Supp.2d 1037 at 1040-41 (E.D. Wis. 2013).

That is a guideline that's based on the commission's presumed expertise and its study of a particular issue is treated with less respect than a guideline that was enacted pursuant to a congressional directive and which is not supported by any empirical evidence or any expertise applied by the Sentencing Commission, which is presumably designated for that role because of its expertise.

That said, I do find that a substantial prison sentence is needed in this case to reflect the seriousness of the offense, which is further aggravated by defendant's post-arrest attempts to have somebody harm the F.B.I. agent. The situation is further aggravated by the fact that defendant committed the offense about six months after he was released from federal prison and while he was on federal supervision.

Defendant also has a substantial prior record, and he's been to prison several times, yet he continues to violate the law. He's in Category VI based on points without

considering guideline 3A1.2(b), and he has a poor history on community supervision, so there is a need for specific deterrence and protection of the public, and there's also a need to deter others.

There's no doubt that ISIS has committed atrocities, as the Government notes in its sentencing memo, and there's also no doubt that ISIS attempts to recruit foreign nationals. The real issue here, it seems to me, is how seriously to take the things the defendant says. Whether it's a commitment to join or fight for ISIS or an attempt to get someone to harm a federal agent or whether it's a threat to a federal judge and his staff, the defendant is plainly willing to say terrible and threatening things. But is he a danger to act on them?

As the Government notes, the defendant's conduct in this case went beyond talk. He cut off his GPS monitoring, and he traveled from Wisconsin to Texas. But where he was actually going to go and what he was actually going to do after that is not entirely clear. He hadn't purchased any ticket to the Middle East. And as far as I can tell, he had no means or specific plan to leave North America.

The defense memo argues with some force that he lacked the capacity, sophistication and resources to do much of anything helpful to ISIS. He certainly appears to fall into the category of "aspirational not operational" discussed in the defense memo. Put another way, Mr. Ludke was not ISIS's top

recruit. We know he didn't actually hurt or attempt to hurt anyone. He didn't possess or attempt to possess any weapons. He didn't acquire any weapons. He didn't provide any weapons or money or information to others to facilitate an attack. It appears that what he did say to the undercover employee about how helpful he could be given his marshal training and his co-defendant's firearms training was all hot air. There's no evidence that any of that stuff that he said to the agent was true.

It further appears his communications were not with actual ISIS members but with F.B.I. agents who had him under surveillance. Finally, it appears that much, if not most, of what he said while detained was either delusional or boosting as indicated on Page 9 of the defense memo. No one seems to believe, for example, that he participated in battles against the Mexican Army, which is one of the things he said.

When the F.B.I. looked into the 2009 claim that he bought guns, explosives and bullet proof vests in order to rob a bank to obtain proceeds to establish a Muslim community to target the U.S. Government, the F.B.I. wasn't able to find any evidence that he purchased any of those materials or he'd done anything along those lines. Providing personnel, including oneself, is no doubt serious as indicated in the cases cited on Pages 4 and 5 of the Government's submission. However, I don't think we can say, as the Government does on Page 4 of its brief,

that the nature and circumstances of the offense could hardly be worse.

As the Government correctly notes in the next paragraph, 2339B covers a range of conduct. And as the Seventh Circuit has noted, sentencing judges should be aware of the concept of marginal deterrence; that is, that the harsher sentences should be reserved for the most culpable behavior; otherwise, there's little room left above the defendant's sentence for those who commit the offense in more harmful ways. See *United States v. Newsom*, N-e-w-s-o-m, 402 F.3rd 780, 785-86 (7th Cir. 2005).

The parties list sentences imposed in other cases. The *Jumaev* court also discussed the sentences imposed in other cases. I see an array of numbers, perhaps, reflecting the different circumstances of each case. It does appear that a number of judges have declined to follow the guidelines in these cases.

As I discussed earlier, following the guidelines in cases like this would avoid disparity but only because just about everybody gets maxed out. Avoidance of disparity is a factor I must consider, but it's hard to glean a lot from these cases other than that material support cases can vary a lot in their facts and severity.

Looking at the defendant's history, his prior record includes the sexual assault case, which was a very serious

matter, but he does not have a history of violence.

His earlier priors are relatively minor property offenses committed when he was a teen. As defendant notes in his memo, his more recent criminal conduct since the 2002-case consists of saying things that are inappropriate as opposed to doing things that are inappropriate or doing anything violent.

I'll also take into account the defendant's history and characteristics. Aside from his criminal record, likely fetal alcohol exposure, neglect and abuse as a child, which is detailed in the Defense Social History Report, then brushes with the law as a teenager. After he failed on probation, he was sent to prison ending up in segregation where his mental health deteriorated. It was at that point that he discovered Islam.

There's reason to wonder how much of his conduct is due to a desire to follow a particular strain of Islam and how much is due to mental instability. When he got out, sex offender -- When he got out of jail, Sex Offender Registration requirements made stable housing for the defendant nearly impossible. He ended up living with the co-defendant. It also appears that during this time he was using marijuana, and it was at that point that he began communicating via social media with this F.B.I. operative.

The defense memo indicates that he was vulnerable to recruitment due to mental health issues, social isolation, identity issues, and it appears that this defendant over the

years has identified with all kinds of religious or of different religions, including Muslim, Jewish, Rastafarian. So Mr. Ludke has been, apparently, committed to different religions at different times in his life.

So given these factors, I do think that treatment and monitoring in the community, can ameliorate his risk of re-offending. I will as conditions of supervised release include drug and mental health treatment and include a computer monitoring program as recommended on Page 14 of the defense memo. Ultimately, I have to balance several things. This is a serious offense, no doubt about it, but defendant's conduct falls toward the mitigated end of the spectrum.

The defendant has a lengthy record. But the recent violations appear to stem almost completely from mental instability and social isolation rather than any violent or predatory disposition. And there is a need to promote respect for the law and to deter others, but doing that without succumbing to the temptation of using this defendant as a means for expressing our horror and outrage at what ISIS has done.

So under all the circumstances, I find the total sentence of 84 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence is based on 3553(a), would be the same regardless of the guidelines. The violations in 09-CR-222 are based on the same conduct as in 16-CR-175, and I see no need to impose consecutive time, see

*U.S. v. Husko*, H-u-s-k-o, 275 F.3rd 600 at 603, (7th Cir. 2001).

I've considered as an aggravating circumstance defendant's status on supervision. And the total sentence I've imposed is sufficient to punish, protect the public and deter. Therefore, the defendant is committed to the Bureau of Prisons for 84 months in Case No. 16-CR-175, and 24 months in Case No. 09-CR-222 running concurrent.

I recommend that he be placed in the Mid-Atlantic Region as requested. Based on his financial condition, I'm not going to impose any fine. Upon release, he's on supervised release for ten years in 16-CR-175. I want to impose a lengthy term to ensure that he's monitored, treated and gets a legitimate job.

While he's on release, he can't commit any crimes. He can't illegally possess or use any controlled substances. And from the P.S.R., he has to comply with Conditions 1 through 15 with any payments conditioned on ability to pay. The defendant shall also allow the probation officer to install computer monitoring software on any computer as defined in 18 U.S.C. 1030(e)(1) that he uses. To ensure compliance with the computer monitoring condition, the defendant must allow probation to conduct initial and periodic unannounced searches of any computers subject to computer monitoring.

The defendant must warn any other people who use these computers that the computers may be subject to searches pursuant

to this condition. The defendant shall pay all costs of participation in the computer monitoring program conditioned on his ability to pay.

Special assessment is $100 due immediately in Room 362. The defendant has a right to appeal if he thinks there's something unlawful. Counsel has a duty to advise him of his right, and he knows the appeal has to be filed within 14 days of the entry of judgment.

If the defendant wants to appeal, can't afford to, he can ask for leave to appeal as a poor person. And as to the other requests about the defendant's name and family address, those -- I'll grant those. Anything further? Okay. Thank you. Good luck to you, Mr. Ludke.

(Whereupon proceeding was concluded.)

# C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified March 4, 2019.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov